UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 3/10/2021

BLUE STONE ENTERTAINMENT LLC,

                      Plaintiff,

v.

AGS CJ CORPORATION, *formerly known as* AMAYA AMERICAS CORPORATION,

                      Defendant.

No. 20-CV-4727 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Blue Stone Entertainment LLC brings this action principally alleging that Defendant AGS CJ Corporation breached a stock purchase agreement of which it is a third-party beneficiary. Now before the Court is Defendant's motion to dismiss the action for failure to state a claim. For the reasons that follow, that motion is granted.

## BACKGROUND

**I.    Factual and Procedural Background**

The facts alleged in the Amended Complaint ("Complaint") are assumed to be true for the purposes of this motion. *See, e.g., Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017). The Court also considers facts drawn from the allegedly breached stock purchase agreement and a related lease, both of which are integral to the Complaint and were relied upon by Plaintiff in drafting it. *See Nicosia v. Amazon.com, Inc.,* 834 F.3d 220, 230-31 (2d Cir. 2016).

Plaintiff Blue Stone Entertainment LLC ("Blue Stone") is a limited liability company based in the state of Washington. Compl. ¶ 1. Defendant AGS CJ Corporation, a Delaware corporation with its principal place of business in Nevada, is the successor by name change to Amaya Americas Corporation ("Amaya[1]"). *Id.* ¶ 2.

On June 10, 2013, Amaya entered into a Stock Purchase Agreement ("SPA") to purchase Diamond Game Enterprises ("Diamond Game"), a vendor of "machines . . . offering a version of donation sweepstakes," from its stockholders for $ 25 million. *Id.* ¶¶ 7-8. At the time of the signing of the SPA, Diamond Game was leasing sweepstakes machines to the Ysleta Del Sur Pueblo Indian tribe (the "Pueblo"), which operated entertainment centers in the El Paso, Texas area. *Id.* ¶ 8. Although the Pueblo was subject to an injunction regarding the violation of various gaming laws entered by the United States District Court for the Western District of Texas in *State of Texas v. Ysleta Del Sur Pueblo, et al.*, No. EP-99-CV-320-KC (W.D. Tex. 1999) (the "Texas Action"), the parties to the SPA "believed the sweepstakes machines were compliant with the [i]njunction and Texas law." *Id.* In September 2013, after the SPA was executed but before closing, the State of Texas filed a contempt motion in the Texas Action alleging that the Pueblo's operation of the machines violated the injunction (the "Texas Motion"). *Id.* ¶ 9. Diamond Game was named as a party to that motion. *Id.*

On January 16, 2014, Diamond Game and Blue Stone entered into an equipment lease agreement, whereby Diamond Game agreed to lease 416 sweepstakes machines and other related accessories (the "Texas Equipment") to Blue Stone. *See* Dkt. 29, Declaration of William A. Wargo in Support of Defendant's Motion to Dismiss the Amended Complaint ("Wargo Declaration"), Exhibit D ("Texas Lease"). The Texas Lease contemplates three methods of terminating the

---

[1] This opinion uses "Amaya" to refer to both Defendant AGS CJ Corporation and its predecessor Amaya Americas Corporation.

arrangement: 1) by either party upon an uncured material breach by the other party, 2) by Diamond Game "following the occurrence of . . . a Texas Clearance Event," or 3) by Diamond Game "following the occurrence of . . . a Texas Event." Texas Lease ¶ 4. Pursuant to the Texas Lease, a "Texas Clearance Event" is defined as "the dismissal of the Texas Motion or Texas Action" or another judicial, legislative, or regulatory event that would permit the continued operation of the Texas Equipment. *Id.* ¶ 1(t). A "Texas Event," by contrast, means a "final disposition of the Texas Motion or Texas Action pursuant to which continued performance under the Texas Lease or otherwise in connection with [Diamond Game's] Business with or related to the [Pueblo] is determined not to be permissible under applicable Law." *Id.* ¶ 1(u). The execution of the Texas Lease, in conjunction with a related lease agreement under which Blue Stone subleased the Texas Equipment to the Pueblo, allowed Diamond Game to terminate its contract with the Pueblo and obtain dismissal from the Texas Action. Compl. ¶¶ 11-12.

On February 13, 2014, Amaya and Diamond Game executed a First Amendment to the SPA that incorporated the Texas Lease. *Id.* ¶ 10; *see* Wargo Declaration, Exhibit C ("SPA Amendment"). The SPA Amendment lists the execution and delivery of the Texas Lease as a "[c]ondition[] [p]recedent to [Amaya]'s [o]bligation to [c]lose." SPA Amendment ¶ 1.3; *see also id.* ¶ 1.6 (defining "Texas Lease"). It also provides for a $7 million "Holdback Amount" from the total purchase price, which Amaya would withhold pending the outcome of the Texas Action. *See* Compl. ¶ 10; SPA Amendment ¶ 1.6. Pursuant to the amended SPA, Amaya was to pay the Holdback Amount to Diamond Game's stockholders following "the satisfaction or waiver of the Texas Clearance Event Conditions." *See* SPA Amendment ¶ 1.1(e). According to the new Section "5.3 Conveyance of Texas Equipment," "[o]n or prior to the tenth (10th) Business Day following [Diamond Game]'s termination of the Texas Lease upon or following the occurrence of a Texas Event, [Amaya] shall cause [Diamond

Game] to convey, transfer, and assign to [Blue Stone], for $1.00, the Texas Equipment . . . ." SPA Amendment ¶ 1.2.  Blue Stone, as "Texas Lease Operator," is expressly designated as a third-party beneficiary to Section 5.3 of the amended SPA.  *See id.* ¶¶ 1.5, 1.6.  A choice-of-law provision provides that the SPA Amendment will be governed and construed in accordance with the laws of the State of New York.  *Id.* ¶ 3.3.

At an unspecified date, but prior to the occurrence of any Texas Event, "Diamond Game [] terminated the Texas Lease, purportedly for cause." Compl. ¶ 25.  According to Blue Stone, Diamond Game "never proved it had the right to terminate the Texas Lease for cause and Diamond Game and Blue Stone subsequently settled matters between them, with neither party admitting any fault." *Id.* ¶ 26.  Because the Texas Lease was terminated prior to the occurrence of any Texas Event, it "could not be 'terminat[e]d . . . upon the occurrence of [the] Texas Event,'" as contemplated in Section 5.3 of the amended SPA. *Id.* ¶ 27.  In a previous lawsuit, to which Blue Stone was not a party, "this Court ruled that the resolution of the Texas Action . . . did not allow for continued used of the [Texas Equipment] and thus, Amaya was not required to pay the Holdback." *Id.* ¶ 17; *see Johnson v. AGS CJ Corp.*, No. 17-CV-7438 (RA), 2020 WL 1689487 (S.D.N.Y. Apr. 7, 2020) (granting Amaya's motion for summary judgment on claim for breach of SPA).  Nonetheless, Amaya failed to cause Diamond Game to convey the Texas Equipment to Blue Stone. *Id.* ¶ 33.  "Diamond Game sold the Texas Equipment in 2015, prior to any determination of the Texas Action." *Id.* ¶ 37.

Blue Stone filed this suit on June 19, 2020, bringing causes of action for breach of contract and unjust enrichment.  Amaya moved to dismiss the complaint on July 30, 2020 on the ground that the complaint failed to state any claim upon which relief could be granted. Dkt. 17.  On August 20, 2020, Blue Stone amended its complaint.  Amaya responded on September 3, 2020 with the instant motion to dismiss.

4

**II.     Allegations in the Complaint**

   **A.      Breach of Contract**

Blue Stone principally alleges that "Amaya breached the SPA when it failed to convey the Texas Equipment to Blue Stone and/or otherwise comply with its Texas Conveyance Obligations following the occurrence of a Texas Event." *Id.* ¶ 35. Although Blue Stone concedes that the preconditions outlined in Section 5.3 of the amended SPA—according to which Diamond Game would convey the Texas Equipment for $1.00 following the termination of the Texas Lease "upon or following" the occurrence of a Texas Event— did not occur, *see id.* ¶ 27, Blue Stone maintains that "[t]his was, however, of no moment to the parties," *id.* ¶ 28.

Blue Stone contends that the amended SPA provided for two potential outcomes. If the Texas Action were resolved in a manner allowing for the continued used of the Texas Equipment, Blue Stone would "step out of the way" and Amaya would be required to pay the $7 million Holdback Amount. *Id.* ¶ 14. Alternatively, if the Texas Action determined that those machines could no longer be lawfully used, Amaya would retain the Holdback Amount and cause Diamond Game to relinquish control of the equipment for which it would have no use. *Id.* Accordingly, Blue Stone contends that Amaya's refusal to cause the conveyance of the Texas Equipment in combination with its retention of the Holdback was "contrary to the spirit, intent, and terms of the [SPA] Amendment." *Id.* ¶ 20. In Blue Stone's view, Amaya's obligation to transfer ownership of the machines was "triggered by the occurrence of what the [SPA] Amendment refers to as a 'Texas Event,'" and there was "no [] reason the timing of the termination of the Texas Lease could have reasonably been of any moment to the parties; *i.e.,* it was not material to the parties if the Texas Lease was terminated before, at the same time as, or after a Texas Event occurred, so long as the Texas Lease was terminated prior to the sale of the machines from Diamond Game to Blue Stone." *Id.* ¶¶ 21, 32.

### B. Unjust Enrichment

Blue Stone also claims that Diamond Game's 2015 sale of the Texas Equipment, which allegedly has prevented Amaya from causing Diamond Game to convey the machines to Blue Stone, has "unjustly enriched [Amaya] to the detriment of Blue Stone." *Id.* ¶ 37. According to Blue Stone, concerns of "[e]quity and good conscience require that Amaya pay restitution" in an amount equal to what Amaya received from the sale of the Texas Equipment. *Id.*

### STANDARD OF REVIEW

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In making that determination, the Court may consider any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any "integral" document on which the plaintiff relied in drafting the complaint. *See Nicosia,* 834 F.3d at 230-31. Generally, a document is considered integral to the complaint when it comprises a "'contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint.'" *Id.* at 231 (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006)).

**DISCUSSION**

**I.      Blue Stone Fails to State a Claim for Breach of Contract**

Amaya contends that the "Amended Complaint fails to state a claim for breach of contract because Blue Stone does not (and cannot) plead that it is entitled to relief under the plain language and the meaning of the contract," and because "[Blue Stone's] claim is flatly contradicted by the language of the contract itself," namely Section 5.3 of the amended SPA.  Mot. at 13.  Blue Stone counters that Defendant's interpretation of Section 5.3 "is not consistent with the parties' intent and would lead to an absurd result that should be rejected," because "[t]he 'upon or following' language of the Amendment on which [Amaya's] position is premised does not . . . create an express condition that requires strict compliance."  Opp. at 7.  Reading the terms of the SPA Amendment according to their plain meaning, as it must, the Court concludes that Blue Stone has failed to plausibly allege that the failure to convey the Texas Equipment breached that agreement.

To state a claim for breach of contract under New York law, a complaint must "allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (internal quotation marks omitted).  Neither party disputes that "[t]he SPA is a binding contract, under which Amaya owes obligations to Blue Stone as a third-party beneficiary," Compl. ¶ 34, nor do they dispute that New York law applies.

"[I]f a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence." *Spinelli v. NFL*, 903 F.3d 185, 200 (2d Cir. 2018) (internal quotation marks omitted).  The Court of Appeals for the Second Circuit defines contractual ambiguity "in terms of whether a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." *Topps Co. v. Cadbury Stani*

7

*S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008).  In other words, "if the contract is capable of only one reasonable interpretation," the Court is "required to give effect to the contract as written." *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996).  As courts must give "effect and meaning to every term of a contract and strive to harmonize all of its terms," "[i]nterpretations that render provisions of a contract superfluous are particularly disfavored." *Spinelli*, 903 F.3d at 200 (internal quotation marks omitted).

  Here, the Court finds Section 5.3 to be straightforward and unambiguous.  That provision, the only one allegedly breached in this lawsuit, requires Amaya to convey the Texas Equipment to Blue Stone "*following* [Diamond Game]'s termination of the Texas Lease *upon or following* the occurrence of a Texas Event," SPA Amendment ¶ 1.2 (emphases added).  That language is susceptible to only one interpretation that would give effect to all its terms.  Blue Stone's entitlement to the Texas Equipment hinges on two conditions: 1) the occurrence of a Texas Event and 2) the termination of the Texas Lease "upon or following" that occurrence.  In this context, the meaning of "upon or following" is equally clear.  That phrase signifies a sequence of events in which the Texas Event must precede the termination of the Texas Lease.  Indeed, that straightforward reading of "upon or following," lest there be any doubt, finds support in the caselaw.  In *Henry v. Dow Jones*, Judge Buchwald found this precise phrase to be "unambiguous," and rejected the plaintiff's proposed interpretation according to which "'upon or following' would need to be interpreted to mean, 'before, upon, or following.'" No. 08 CIV. 5316 (NRB), 2009 WL 210680, at *5 (S.D.N.Y. Jan. 28, 2009).

  Blue Stone offers no alternative interpretation of "upon or following," let alone a plausible one, that would convince the Court of Section 5.3's ambiguity.  Instead it alleges that the chronological relationship between the termination of the Texas Lease and the occurrence of a Texas Event was "of no moment to the parties."  Compl. ¶ 28.  To support that allegation, Blue Stone

8

furthers a purposive interpretation of the contract. In its view, the objective of the SPA Amendment was to provide for distinct arrangements depending on whether a Texas Clearance Event or a Texas Event occurred. In the former scenario, in which continued operation of the Texas Equipment would be lawful, Amaya would pay the $7 million Holdback amount to Diamond Game's shareholders and retain the machines. In the latter scenario, in which the Texas Equipment could no longer be lawfully operated, Amaya would retain the Holdback and essentially give the machines to Blue Stone. Under no scenario would Amaya keep both the $7 million and the Texas Equipment. Blue Stone argues that this interpretation better "reflect[s] the rational value proposition at the heart of the parties' bargain." Opp. at 9. That may be true. It is plausible that the parties would agree to such a bargain under these circumstances. The Court cannot, however, square that interpretation with the "contract as written." *K. Bell & Assocs., Inc.*, 97 F.3d at 637.

The text of Section 5.3 indicates that the parties struck a different bargain. As written, that provision conditions Blue Stone's entitlement to the Texas Equipment upon the occurrence of a specific sequence of events. Adoption of Blue Stone's purposive interpretation of the SPA would require disregarding the plain language of that provision. The Court declines to interpret the SPA Amendment in a way that would read "upon or following" out of the contract, render it superfluous, or change its meaning to "before, upon, or following," *see Henry*, 2009 WL 210680, at *5. The only plausible textual interpretation of Section 5.3 is that the Texas Event must precede termination of the Texas Lease in order for Blue Stone to be entitled to the Texas Equipment.

The validity of that interpretation, based on the plain meaning of an unambiguous contractual provision, is unaffected by Blue Stone's allegation that it "bestows an unjustified and unlawful windfall" to Amaya in which it is able to retain both the $7 million Holdback and the Texas Equipment. Opp. at 2. That Amaya appears to have obtained the better end of the bargain does not

create an "impermissibly absurd and irrational result." *See* Opp. at 7. The result of the literal interpretation of the contract is that Amaya purchased Diamond Game—from its shareholders, not Blue Stone—for $18 million instead of the originally agreed-upon $25 million. That reduction of price plausibly reflects the reduction in the business's value following the Texas Event, which limited the utility of the Texas Equipment. The Court therefore does not find such a result to be "absurd," let alone to a degree that would justify disregarding the plain meaning of the contract on a motion to dismiss. Blue Stone nevertheless argues that the Court should avoid "formalistic literalism" or "hypertechnical" interpretations and construe language to best effectuate what it characterizes as the reasonable expectations of the parties. *See* Opp. at 7-10. That canon, however, applies to the construction of language that is ambiguous. It thus has no relevance here. As noted above, the Court cannot conceive of any other plausible construction of Section 5.3, nor has Blue Stone supplied one. Where, as here, the plain meaning of a contract is apparent, New York law demands that that meaning control. *See Spinelli*, 903 F.3d at 200. The Court refuses to re-write the contract so as to accord with a third-party-beneficiary's view of what a reasonable bargain would have been.

For similar reasons, the Court rejects Blue Stone's argument that "[t]he 'upon or following' language of the Amendment . . . does not create an express condition that requires strict compliance." Opp. at 7. According to the New York Court of Appeals, a "condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 690 (1995); *see also* Restatement (Second) of Contracts § 224 ("A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due."). "'[T]o the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its

10

occurrence was a material part of the agreed exchange.'" *Oppenheimer*, 86 N.Y.2d at 691 (quoting Restatement (Second) of Contracts § 229).

First, Blue Stone maintains that the Court should interpret "upon or following the Texas Event" as embodying a "promise or constructive condition rather than an express condition" because Section 5.3 does not employ the "'unmistakable language'" of a condition precedent. Opp. at 14 (quoting *Oppenheimer*, 86 N.Y.2d at 690). Again, this canon for the interpretation of "doubtful language" is inapposite. The Court finds no ambiguity in the phrase "upon or following." The text of Section 5.3 leaves no doubt about its intended requirements. Categorizing a particular provision as a "condition precedent" does not absolve Blue Stone from compliance with that provision.

Second, Blue Stone argues that the sequence of events was "immaterial to the parties' bargain," a conclusion that allows the Court to "excuse its performance." Opp. at 17. The Court is unpersuaded. As an initial matter, Blue Stone fails to explain why the Court should excuse the "upon or following" condition, but enforce the condition that immediately precedes it, "following [Diamond Game's] termination of the Texas Lease." SPA Amendment ¶ 1.2. Moreover, excusing the condition upon which Blue Stone is entitled to the Texas Equipment would fundamentally alter the contract. As explained above, the agreement provides for the conveyance of the Texas Equipment if, and only if, two conditions are met. Blue Stone's entitlement to the equipment is contingent on the occurrence of a Texas Event and the termination of the lease. Thus, if the lease were terminated pursuant to a Texas Clearance Event, Blue Stone would not be entitled to the equipment. The same result occurs if the lease was terminated for cause, rather than upon the occurrence of a Texas Event or Texas Clearance Event. Although Blue Stone disputes the fairness of that result, it is consistent not only with the SPA, but also with the Texas Lease. That agreement—the execution of which is an express condition precedent to the SPA, *see* SPA Amendment ¶ 1.3—contemplates three termination

scenarios: 1) by Diamond Game following a Texas Event; 2) by Diamond Game following a Texas Clearance Event; and 3) by either party for cause.  Texas Lease ¶ 4.  The SPA Amendment entitles Blue Stone to the Texas Equipment only upon the occurrence of scenario 1.  The plain-meaning interpretation of Section 5.3 of the SPA Amendment thus accords with the larger contractual structure.  As a result, the Court declines to excuse the performance of a contractual requirement based on the allegation that the condition was immaterial to the parties.

In sum, the Court is not persuaded by any of Blue Stone's arguments about why it should not give effect to the plain meaning of Section 5.3 of the amended SPA.  Because Blue Stone concedes that the Texas Lease was terminated prior to, rather than "upon or following," a Texas Event, *see* Compl. ¶ 27, it has not alleged facts to plausibly demonstrate its contractual entitlement to the Texas Equipment.  As a result, its claim of breach must fail.

## II.     Blue Stone Fails to State a Claim for Unjust Enrichment

Amaya argues that the Court should dismiss the claim for unjust enrichment because "[i]t is black letter law that [Blue Stone] cannot proceed on the basis of unjust enrichment where there is a contract that covers the dispute at issue." Mot. at 20.  Blue Stone, relying on one 1993 intermediate appellate decision, argues that claims for breach of contract and unjust enrichment are not "mutually exclusive in all events and under all circumstances." Opp. at 19 (quoting *Joseph Sternberg, Inc. v. Walber 36th St. Assocs.*, 594 N.Y.S.2d 144 (1st Dep't 1993)).  The Court agrees with Amaya that Blue Stone has failed to state a claim for unjust enrichment.

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (internal quotation marks omitted).  The Second Circuit has emphasized that

"the theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates *in the absence of any agreement.*" *Id.* (internal quotation marks omitted; emphasis in *Beth Israel Med. Ctr.*). Accordingly, a plaintiff cannot recover under a theory of unjust enrichment where valid and enforceable agreements govern the "particular subject matter of [the] case." *Id.* at 587.

Under this standard, Blue Stone's claim must fail. Because that claim concerns Amaya's obligation to cause the conveyance of the Texas Equipment to Blue Stone, an obligation created and governed by the SPA Amendment, New York law bars Blue Stone from recovering under a theory of unjust enrichment. The one case cited by Blue Stone is not the contrary. *See Joseph Sternberg, Inc.*, 594 N.Y.S.2d at 144 (holding that a plaintiff may proceed upon a theory of quantum meruit and breach of contract "where there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue"). Because Blue Stone proceeds under a theory of unjust enrichment over a dispute plainly covered by a contractual arrangement, that case is inapposite. Accordingly, Blue Stone's claim must be dismissed.

## CONCLUSION

For the foregoing reasons, Defendant's motion is granted. The Clerk of Court is respectfully directed to close this case.

SO ORDERED.

Dated:  March 10, 2021
        New York, New York

_____
Ronnie Abrams
United States District Judge

13